[Cite as *In re K.D.*, 2019-Ohio-1077.]

IN THE COURT OF APPEALS OF OHIO

TENTH APPELLATE DISTRICT

In the Matter of:                              :

                                                              No. 18AP-746
[K.D.],                                             :              (C.P.C. No. 16JU-6823)

[S.F.,                                              :        (ACCELERATED CALENDAR)

        Appellant].                          :

―――――――――――――――――

D E C I S I O N

Rendered on March 26, 2019

―――――――――――――――――

**On brief:** *Nicole L. Thornton*, Guardian ad Litem.

**On brief:** *Robert J. McClaren*, for Franklin County Children Services.

**On brief:** *William T. Cramer*, for appellant.

―――――――――――――――――

APPEAL from the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch

LUPER SCHUSTER, J.

{¶ 1}  Appellant, S.F. ("biological father"), biological father of K.D., appeals from the decision and judgment entry of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch, terminating his parental rights and placing K.D. in the permanent custody of appellee, Franklin County Children Services ("FCCS").  For the following reasons, we affirm.

**I.  Facts and Procedural History**

{¶ 2}  This case involves FCCS's request for permanent custody of K.D., born December 2011.  At the time of K.D.'s birth, K.D.'s mother was married to D.D. ("legal father"), and D.D. became K.D.'s legal father.  However, subsequent DNA testing confirmed S.F. is K.D.'s biological father.

{¶ 3}  Prior to the instant action, K.D. had been the subject of four complaints brought by FCCS since 2015 regarding an allegation of abuse, neglect, and/or dependency. The fifth, and most recent, complaint, which is the fourth refiling of the original complaint and is the subject of this case, was filed on May 31, 2016 and alleges K.D. is an abused, neglected, and dependent child.  At that date, K.D. was four years old and was already in the temporary custody of FCCS, not living with mother and legal father.  FCCS filed the abuse, neglect, and dependency action after receiving information that K.D. was the victim of sexual activity, that mother and legal father were injecting heroin with K.D. present, that there is domestic violence between mother and legal father, that the home conditions are "deplorable," the home has no water or gas due to mother and legal father's drug use, that police have been dispatched to the home seven times in a one-month period to respond to issues concerning narcotics, guns, and domestic violence, and that mother and legal father have not made K.D. available to FCCS to assess her safety.  (May 31, 2016 Compl. at 1.)  The complaint states K.D. has a developmental disability, a genetic disorder, and requires physical and speech therapy.  Additionally, the complaint states K.D. required treatment from an ENT due to possibly being hit in the face, and K.D. required dental procedures to remove rotten teeth.  Moreover, the complaint states K.D. disclosed sexual abuse by both mother and legal father.  K.D. has been diagnosed with a mental health condition and requires psychiatric and psychological care.

{¶ 4}  Pursuant to the complaint, mother had missed 16 drug screens and legal father had not completed orientation for drug treatment program.  Mother has attended supervised visits with K.D. while under the influence of drugs.  At the time of the complaint, legal father had a domestic violence criminal conviction from 2014 and a pending revocation warrant.

{¶ 5}  The trial court granted FCCS a temporary order of custody ("TOC") on June 2, 2016 and issued no contact orders with the child by mother and legal father.  Subsequently, in an uncontested proceeding on July 5, 2016, the trial court adjudicated K.D. an abused, neglected, and dependent minor, and the trial court again ordered mother and legal father to have no contact with K.D.  Biological father, who resides in Iowa, then filed a motion for legal custody on August 2, 2016.

{¶ 6}   At a subsequent dispositional hearing on August 19, 2016, the trial court granted an order of temporary custody and commitment ("TCC") to FCCS, approved a case plan, ordered mother and legal father to have no contact with K.D., and ordered FCCS not to place K.D. with biological father without a court hearing.  While the trial court dismissed biological father's motion for legal custody, it permitted biological father to remain a party to K.D.'s case.  The trial court also ordered that a copy of the phone call schedule between K.D. and biological father be given to K.D.'s counselor.

{¶ 7}   FCCS filed a motion for a second extension of the TCC order on November 29, 2016, and the trial court granted the motion to extend on January 10, 2017 with additional orders that the child's guardian ad litem be notified prior to any change in placement and that FCCS was to confer with K.D.'s therapist to determine an appropriate schedule for visits with biological father.  On March 22, 2017, FCCS then filed a motion to approve an amended case plan to add for biological father mental health assessment and services, a psychological assessment and recommendations, parenting classes, visitation, participation in the child's treatment and needs as recommended by K.D.'s professional providers, and cooperation with Interstate Compact on the Placement of Children ("ICPC") services.  FCCS additionally proposed that legal father perform a domestic violence assessment.  Then, on May 5, 2017, FCCS filed a motion asking the trial court to review the August 19, 2016 order regarding K.D.'s visits with biological father.

{¶ 8}   On June 1, 2017, the magistrate granted FCCS's motion to approve and adopt the amended case plan, suspending biological father's face-to-face parenting time until further court hearing.  However, the order permitted regular telephone contact between K.D. and biological father to continue pursuant to the schedule determined between FCCS and biological father.

{¶ 9}   Eventually, on June 6, 2017, FCCS filed a motion for permanent court commitment ("PCC"), also known as permanent custody, of K.D.  The trial court held a pretrial conference on September 20, 2017 and set a status conference to allow time for biological father to undergo a psychological evaluation, a parent/child observation, and for completion of the ICPC process in Iowa.  However, as of December 1, 2017, neither the ICPC process nor the parent/child observation had been completed.  Thus, the trial court set another status conference for March 2, 2018.

{¶ 10} At the final status conference on July 11, 2018, the trial court ordered a face-to-face visit between K.D. and biological father to allow observation by the caseworker. Subsequently, on August 12, 2018 the attorney guardian ad litem and the lay guardian ad litem filed a joint report recommending the court grant FCCS's motion for permanent custody.

{¶ 11} The matter ultimately came for trial on August 20, 2018. Neither mother nor legal father appeared for trial. However, biological father appeared and testified that he had five children, including K.D. His other four children are grown. Biological father testified that he currently lives in Iowa with his adult daughter and her children, ages 11 and 5. The 11-year-old has spina bifida and is confined to a wheel chair, and biological father testified he regularly physically assists his grandson and attends doctor appointments. Additionally, biological father testified his grandson has an IEP for school and that biological father has participated in the IEP process with his grandson.

{¶ 12} Biological father testified he met mother online in 2009 or 2010 and that she agreed to move to Iowa to live with him. However, biological father said mother moved back to Ohio when she was pregnant and never returned, telling biological father she had miscarried the pregnancy. Biological father said he saw a picture of mother with a baby on her lap and suspected he might be the child's father due to the timing of the photograph. He said he inquired with mother's relatives about the baby and was told that legal father was the child's father.

{¶ 13} Biological father testified he learned that K.D. had been removed from mother's care in September 2015 and he then became involved in K.D.'s case. In November 2015, biological father completed DNA testing. FCCS added biological father to K.D.'s case plan in December 2015. The parties agree that none of the allegations in the original complaints related to biological father.

{¶ 14} Biological father testified he first met K.D. in December 2015 when he attended a visit with K.D.'s maternal grandparents. He then received scheduled visitations with K.D. for one time a month moving forward. However, in October 2015, after only two visits between biological father and K.D., FCCS requested biological father's visits be cancelled based on the recommendation of K.D.'s therapist. Biological father participated

in a parent-child observation in February 2018 and again in August 2018, just prior to trial, for a total of four visits since December 2015.

{¶ 15} Alysha Stuck, the caseworker from FCCS assigned to K.D.'s case, testified that both mother and legal father failed to complete the case plan. FCCS referred mother and legal father for numerous drug programs but neither one followed through. Additionally, Stuck testified mother and legal father were inconsistent with visitation prior to the no-contact order in November 2015, and there were no visitations at all after the no-contact order due to K.D.'s disclosing sexual and physical abuse to her therapist. Ultimately, FCCS lost contact with mother and legal father in March 2016.

{¶ 16} Stuck further testified that K.D. has been in continuous custody of FCCS since June 29, 2015, and that K.D. had been in the same foster placement from July 2015 to July 2018. However, following concerns regarding the foster mother's driving "erratically" with children in the car, including driving on sidewalks and curbs, FCCS placed K.D. in respite care while it investigated the situation. (Aug. 20, 2018 Tr. at 90.) Once K.D. was in respite care, Stuck testified her behavior started to improve, and the respite care ultimately transitioned into a new foster home for K.D. K.D. has been with her current foster parents since July 2018, and she had a previous relationship with the new foster parents because they had previously served as respite care for K.D. Stuck testified K.D. is doing well in her new foster home, has good communication with her new foster parents, refers to her foster parents as "mom" and "dad," hugs her new foster parents, and K.D. is bonded with her new foster parents. (Aug. 20, 2018 Tr. at 130.) The new foster home is a potential adoptive home. Additionally, Stuck noted that since her placement in the new foster home, K.D. has ceased wetting her pants and there has been a decrease in K.D.'s other behavioral disturbances.

{¶ 17} Stuck testified regarding the requirements of biological father's case plan. Pursuant to the case plan, biological father was to have stable housing and income; maintain consistent visits with K.D.; complete the ICPC process and follow any recommendations; attend K.D.'s medical appointments; complete a domestic violence assessment, parenting classes, and a psychological evaluation; and ensure K.D.'s needs were met. Stuck agreed that biological father had stable housing and income.

{¶ 18} With regard to the parenting classes, FCCS referred biological father to a parenting class in Iowa. While the program did not have a set number of classes needed for completion, biological father stopped attending after three classes because he felt the sessions were not beneficial to K.D.'s needs. Stuck testified that FCCS then encouraged biological father to maintain contact with K.D.'s therapist as an alternative way to get more direct recommendations on the care K.D. would require, but biological father failed to do so. Thus, Stuck said biological father did not complete the parenting classes portion of the case plan.

{¶ 19} As to the domestic violence assessment, Stuck testified it was made a requirement of biological father's case plan because he had a prior criminal conviction in Iowa for domestic violence. Biological father was referred for individual counseling. Stuck testified biological father has consistently attended counseling for one year, but that this portion of the case plan is ongoing and not completed.

{¶ 20} Stuck testified that it was "extremely common" for K.D. to report that she did not want to participate in telephone calls with biological father, and that K.D. would frequently indicate her stomach hurt when it was time to make a phone call. (Aug. 20, 2018 Tr. at 117.) While Stuck said she did not have any particular concerns in her observations of the in-person visits between K.D. and biological father, K.D. reported after the most recent visit in August 2018 that she did not want to do any more visits with biological father. Stuck testified K.D. exhibits "mixed emotions" about the visits with biological father, and she said she does not believe K.D. is bonded with biological father. (Aug. 20, 2018 Tr. at 121.) Stuck agreed it would be difficult for K.D. to form a bond with biological father after only four, short in-person visits over the course of three years.

{¶ 21} Regarding the ICPC requirements, Stuck testified biological father completed two ICPC assessments. The first was denied due to biological father's criminal and legal history, including a sexual abuse allegation from 2001 that Iowa children's services deemed "founded," a 2001 domestic abuse conviction, and a 2005 conviction for operating a vehicle while intoxicated. (Aug. 20, 2018 Tr. at 110.) The second ICPC was approved with recommendations that biological father complete visitation with K.D., participate in K.D.'s treatment, and continue a parenting program. Stuck testified biological father had not followed through with those recommendations as of the time of trial. She additionally

testified that the reason the second ICPC was approved was because by the time of the second ICPC, more than ten years had passed since biological father's most recent criminal conviction.

{¶ 22} Despite the fact that the ICPC was technically approved, Stuck testified that FCCS continued to have concerns with biological father stemming from the founded allegation of sexual abuse. Specifically, the allegation was that biological father repeatedly sexually abused his step-daughter from the time she was in seventh grade until she was a senior in high school. Stuck testified this allegation presents concern for FCCS in considering placing K.D. with biological father. Additionally, Stuck testified FCCS had additional concerns stemming from the psychological evaluation that biological father completed in which biological father attempted to minimize his history of sexual abuse allegation despite the finding that the allegation was "founded." At trial, biological father continued to deny the past allegation of sexual abuse, testifying his ex-wife manufactured the claim as part of a contentious divorce.

{¶ 23} FCCS also had concerns that biological father reported in his psychological evaluation that he had no history of domestic violence despite his 2001 conviction for domestic abuse. Thus, despite biological father technically completing the psychological component of his case plan, Stuck testified K.D.'s service team continues to have "concerns" about biological father. (Aug. 20, 2018 Tr. at 115.)

{¶ 24} Stuck also testified about K.D.'s medical needs. K.D. has post-traumatic stress disorder ("PTSD") and reactive attachment disorder. She has issues with wetting her pants during the day and masturbation, as well as two self-harm incidents at school in which she threatened to hurt herself with scissors. K.D. sees a psychiatrist every six months and receives trauma therapy once a week. Additionally, K.D. takes medication for PTSD and to help with sleep. Although biological father maintained contact with the FCCS service team and participated in all the case reviews, he did not attend K.D.'s appointments. FCCS asked biological father to maintain contact with K.D.'s counselors and providers, but K.D.'s therapist did not feel it was appropriate for biological father to be involved. As a result, FCCS would update biological father on K.D.'s medical and educational appointments but did not provide him with the actual schedule of appointments. Biological father testified he attempted to communicate with K.D.'s school and therapist but they refused to

communicate with him without a release from FCCS. Biological father additionally testified that he had been in contact with a school in Iowa about K.D.'s potential needs but was told the school could not make any progress on an IEP for K.D. until they could personally evaluate her.

{¶ 25} K.D. visits with her maternal grandparents approximately once a week, and the guardian ad litem concluded those visits are in K.D.'s best interest. The new foster home has expressed willingness to continue the visits with the maternal grandparents. Additionally, maternal grandparents oppose biological father getting custody of K.D. out of fear that he may sexually abuse K.D.

{¶ 26} Victoria Shaker, K.D.'s guardian ad litem, also testified. Shaker testified she did not see a significant bond between biological father and K.D., and she noted K.D.'s discomfort with the telephone contact with biological father. Shaker testified she has ongoing concerns with the sexual abuse allegation against biological father, especially given K.D.'s history of acting out sexually. Additionally, Shaker testified that K.D. is "doing very well" in her current foster home, noting that she has ceased wetting her pants and has demonstrated an ability to redirect her urges for behavior outbursts. (Aug. 21, 2018 Tr. at 23.)

{¶ 27} Ultimately, both the FCCS caseworker and the guardian ad litem testified it was their recommendation that granting the request for PCC for purposes of adoption was in K.D.'s best interest.

{¶ 28} Following the trial, the trial court granted FCCS's motion for permanent custody of K.D. The trial court considered the factors in R.C. 2151.414(D) and determined there was clear and convincing evidence that it was in K.D.'s best interest to grant the motion for permanent custody. The court journalized its decision in a decision and judgment entry dated September 21, 2018. Biological father timely appeals.

## II. Assignments of Error

{¶ 29} Biological father assigns the following errors for our review:

> [1.] The trial court's determination that appellant's parental rights should be terminated is not supported by clear and convincing evidence.

[2.] The trial court's determination that the agency made reasonable efforts to unify this family is not supported by clear and convincing evidence.

## III. Standard of Review

{¶ 30} "In reviewing a judgment granting permanent custody to FCCS, an appellate court 'must make every reasonable presumption in favor of the judgment and the trial court's findings of facts.' " *In re J.T.*, 10th Dist. No. 11AP-1056, 2012-Ohio-2818, ¶ 8, quoting *In re P.G.*, 10th Dist. No. 11AP-574, 2012-Ohio-469, ¶ 37. " '[I]f the evidence is susceptible of more than one construction, we must give it that interpretation which is consistent with the verdict and judgment, most favorable to sustaining the [juvenile] court's verdict and judgment.' " *In re Brooks*, 10th Dist. No. 04AP-164, 2004-Ohio-3887, ¶ 59, quoting *Karches v. Cincinnati*, 38 Ohio St.3d 12, 19 (1988).

{¶ 31} "Judgments are not against the manifest weight of the evidence when all material elements are supported by competent, credible evidence." *J.T.* at ¶ 8. "Pursuant to R.C. 2151.414(B)(1), a trial court may grant permanent custody if after a hearing it determines, by clear and convincing evidence, that * * * such relief is in the best interest of the child." *Id.* at ¶ 9. "Clear and convincing evidence is that degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the facts to be established." *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 14. "It is more than a mere preponderance of the evidence but does not require proof beyond a reasonable doubt." *Id.*

## IV. First Assignment of Error – Best Interest of the Child

{¶ 32} In his first assignment of error, biological father asserts the trial court erred in granting permanent custody to FCCS. More specifically, biological father argues the trial court erred when it determined the termination of his parental rights was in the best interest of the child.

{¶ 33} "Parents have a constitutionally-protected fundamental interest in the care, custody, and management of their children." *In re H.D.*, 10th Dist. No. 13AP-707, 2014-Ohio-228, ¶ 10, citing *Troxel v. Granville*, 530 U.S. 57, 65 (2000). The Supreme Court of Ohio recognizes the essential and basic rights of a parent to raise his or her child. *In re Murray*, 52 Ohio St.3d 155, 157 (1990). However, these rights are not absolute, and a

parent's natural rights are subject to the ultimate welfare of the child. *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979). In certain circumstances, therefore, the state may terminate the parental rights of natural parents when such termination is in the best interest of the child. *H.D.* at ¶ 10, citing *In re E.G.*, 10th Dist. No. 07AP-26, 2007-Ohio-3658, ¶ 8, citing *In re Harmon*, 4th Dist. No. 00 CA 2694 (Sept. 25, 2000); *In re Wise*, 96 Ohio App.3d 619, 624 (9th Dist.1994).

{¶ 34} In deciding to award permanent custody, the trial court must take a two-step approach. *K.L.* at ¶ 18. The court must first determine if any of the factors set forth in R.C. 2151.414(B)(1) apply. *Id.* Here, there is no dispute that K.D. was in the temporary custody of one or more public children service agencies or private child placing agencies for 12 or more months of a consecutive 22-month period, satisfying R.C. 2151.414(B)(1)(d).

{¶ 35} Once the trial court determines that one of the circumstances in R.C. 2151.414(B)(1) applies, the trial court must then determine whether a grant of permanent custody is in the best interest of the child. *In re A.J.*, 10th Dist. No. 13AP-864, 2014-Ohio-2734, ¶ 16; R.C. 2151.414(B)(1). In determining the best interest of a child, R.C. 2151.414(D)(1) directs that the trial court must consider all relevant factors including, but not limited to, the following:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;
>
> (b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
>
> (c) The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, or the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period and, as described in [R.C. 2151.413(D)(1)], the child was previously in the temporary custody of an equivalent agency in another state;

> (d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;
>
> (e) Whether any of the factors in [R.C. 2151.414(E)(7) to (11)] apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 36} The trial court considered all of the above statutory factors with respect to K.D. and concluded that an award of permanent custody was in the best interest of the child. Biological father disagrees with the juvenile court's conclusions. We will address biological father's argument with respect to each of the statutory factors.

## A. R.C. 2151.414(D)(1)(a) – Parent, Child, and Sibling Interrelationships

{¶ 37} The testimony from the FCCS caseworker and the guardian ad litem was consistent that K.D. is not bonded with biological father. She has a good relationship with her current foster parents and her behavior has improved since her placement there. Though biological father argues the lack of bond between him and K.D. is attributable to his limited visits with K.D., we note that K.D. often expressed that phone calls with biological father made her stomach hurt and she expressed a desire to no longer visit with biological father. Based on the evidence presented, this factor weighs in favor of an award of permanent custody to FCCS.

## B. R.C. 2151.414(D)(1)(b) – The Child's Wishes

{¶ 38} There was no in camera interview of K.D. However, based on K.D.'s communications with the caseworker and the guardian ad litem, as well as their observations of K.D.'s behavior, K.D. did not have the maturity or ability to fully understand the concepts of permanent custody and adoption. Both the caseworker and the guardian ad litem reiterated that K.D.'s behavior has improved in her most recent foster placement, and that improvement of behavior seemed to be indicative of her comfort level with her current placement. The caseworker and the guardian ad litem also expressed concern about how moving K.D. to a placement with biological father would affect K.D. given how long she has been in the continuous custody of FCCS.

#### C. R.C. 2151.414(D)(1)(c) – Custodial History of the Child

{¶ 39} At the time FCCS filed for permanent custody, K.D. had been in the temporary custody of FCCS for more than 23 months, which is more than 12 of a consecutive 22-month period. Further, by the time trial commenced in August 2018, K.D. had been in FCCS custody for more than 3 years. Biological father does not raise any argument with respect to this factor.

#### D. R.C. 2151.414(D)(1)(d) – Need for Legally Secure Placement

{¶ 40} The final consideration under R.C. 2151.414(D)(1) is the child's need for a legally secure placement and whether that type of placement can be achieved without a grant of permanent custody to FCCS. It is through this factor that biological father argues the trial court erred in determining granting FCCS's motion for permanent custody is in K.D.'s best interest.

{¶ 41} As the trial court noted in its decision and judgment entry, K.D. has lived most of her life without a secure placement. She has been in continuous foster care for more than three years due to her mother and legal father's abuse and neglect. After spending more than two years in the same foster placement, her stability was disrupted following concerns that her then foster mother's erratic driving posed a danger to K.D. Additionally, K.D. has special needs, including PTSD, reactive attachment disorder, possible intellectual and developmental issues, and behavioral issues requiring an IEP for school. She receives treatment from an occupational therapist, a speech therapist, a primary care physician, a psychiatrist, a children's therapist, and a trauma-based therapist. We agree with the trial court that K.D. is in great need of a legally secure placement.

{¶ 42} Biological father agrees that K.D. is in great need of a legally secure placement, but he disagrees with the trial court's conclusion that placing K.D. in his care would not achieve such a legally secure placement. Though biological father established paternity through DNA testing during the fourth refiling of FCCS's complaint, he nonetheless waited more than four years to make contact with K.D. despite believing he was her father from the time she was an infant. Biological father does not dispute the trial court's conclusion that he had not formed much of a bond with K.D., but he blames their lack of bond on geographical distance and FCCS's decision to suspend his in-person visits

pursuant to the recommendation of K.D.'s therapist. As the trial court notes, however, biological father chose to remain in Iowa after learning he was K.D.'s biological father.

{¶ 43} The trial court noted additional concerns with biological father as a placement option for K.D. On top of the non-existent bond between biological father and K.D., biological father also had a history of domestic violence, driving under the influence, and a "founded" prior allegation of sexual abuse of his step-daughter. His history led to the denial of biological father as a suitable placement under the first ICPC. Though the second ICPC was approved due to passage of time, both the FCCS caseworker and the guardian ad litem testified they had ongoing concerns with biological father's background.

{¶ 44} While biological father was permitted telephone contact with K.D. three times a week, the testimony indicated biological father was inconsistent in calling K.D. until an order of the trial court monitored the calls. The trial court found that biological father's own actions "contributed greatly" to the delay and limitation of in-person visits with K.D. (Sept. 21, 2018 Decision & Jgmt. Entry at 15.)

{¶ 45} Despite the lack of bond, biological father argues he has substantially complied with his case plan, including maintaining stable housing and income, attending counseling, and attending some parenting classes. However, "R.C. 2151.414(D) does not require courts to deny a children services agency's motion for permanent custody solely by virtue of a parent's substantial compliance with the case plan." *Brooks* at ¶ 62.

{¶ 46} We agree with the trial court that while biological father seems "well-intentioned," his efforts in the more than two years that he became involved in the case were not significant enough to form a bond with K.D. (Decision & Jgmt. Entry at 16.) Though he asserts that he attempted to make contact with K.D.'s treatment providers but was told he was not authorized to receive information, biological father provided no evidence that he attempted to follow up with FCCS to obtain a release to speak with K.D.'s treatment providers. He was uncertain of K.D.'s exact diagnoses and treatment needs. He stopped attending parenting classes after only three classes because he determined they were not helpful to K.D.'s specific situation. Despite being ordered to undergo a domestic violence assessment as part of the case plan, he declined to do so, and he minimized the significance of his past history of domestic violence and sexual abuse allegations in his psychological evaluation. During his testimony, biological father repeatedly blamed FCCS

for the lack of a bond between himself and K.D., failing to account for the ways his actions and inactions contributed to the lack of bond. By his own admission, biological father made no effort to be a part of K.D.'s life until she was in the temporary custody of FCCS, and he does not seem to recognize that his complete absence from the first four years of K.D.'s life is likely the predominant factor in the lack of a parent-child bond.

{¶ 47} The trial court additionally noted that in her current treatment foster home, K.D. is bonded to her foster parents, appears comfortable, is attaching, improving, and happy. There is a great need for K.D. to maintain access to her team of doctors and therapists that have been in place for over three years, and her current foster home, which is a prospective adoptive home, provides her that continued access.

{¶ 48} Based on all the testimony and evidence presented, including the entire case file, the trial court determined permanent custody is in the best interest of the child. Having reviewed the entire record, we conclude the trial court had clear and convincing evidence to conclude permanent court commitment was in the best interest of K.D. Accordingly, we overrule biological father's first assignment of error.

## V. Second Assignment of Error – Efforts to Reunify the Family

{¶ 49} In his second and final assignment of error, biological father argues the trial court erred in concluding FCCS made reasonable efforts to reunify the family. Under R.C. 2151.413(D)(3)(b), a children's services agency may not file for permanent custody "[i]f reasonable efforts to return the child to the child's home are required under [R.C. 2151.419, and] the agency has not provided the services required by the case plan to the parents of the child or the child to ensure the safe return of the child to the child's home." R.C. 2151.419(A)(1) provides that a children's services agency must prove that it has made "reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home."

{¶ 50} Biological father relies on the Supreme Court of Ohio's decision in *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, for the proposition that "the state must have made reasonable efforts to reunify the family prior to the termination of parental rights." *C.F.* at ¶ 21. However, the Supreme Court continues to hold in *C.F.* that the reasonable efforts requirement under "R.C. 2151.419(A)(1) does not apply in a hearing on a motion for

permanent custody filed pursuant to R.C. 2151.413." *C.F.* at ¶ 43. "This is because a child support agency must have proven reasonable efforts prior to filing a motion for permanent custody." *In re A.N.F.*, 10th Dist. No. 17AP-905, 2018-Ohio-3689, ¶ 21, citing *In re E.R. J.R.*, 10th Dist. No. 17AP-82, 2017-Ohio-7188, ¶ 53. "If the agency has not established that reasonable efforts have been made prior to the hearing on a motion for permanent custody, then it must demonstrate such efforts at that time." *C.F.* at ¶ 43. Thus, where the record reflects that the trial court has made a finding that the agency has made reasonable efforts as required by R.C. 2151.419(A)(1), the prohibition on filing a motion for permanent custody under R.C. 2151.413(D)(3)(b) does not apply. *A.N.F.* at ¶ 21, citing *In re K.L.*, 10th Dist. No. 13AP-218, 2013-Ohio-3499, ¶ 40.

{¶ 51} Here, the trial court made findings that FCCS made reasonable efforts to prevent the continued removal of the child from the home on January 10, 2017. At that time, the finding stated biological father was not participating in case services and has a criminal background including sexual abuse of a minor. These findings satisfy the reasonable efforts requirement under R.C. 2151.419(A)(1). *A.N.F.* at ¶ 22.

{¶ 52} Despite this finding, biological father argues FCCS did not do enough to facilitate reunification with K.D. As K.D. has never lived with biological father, it seems biological father's argument has less to do with reunification and instead correlates to his argument under the first assignment of error that the trial court should not have found granting FCCS's motion for permanent custody to be in the best interest of the child. Biological father again blames FCCS for the lack of bond between biological father and K.D., alleging FCCS failed to provide him with specific referrals for parenting classes and domestic violence counseling, failed to provide him with the appropriate releases to be able to communicate with K.D.'s treatment providers, and failed to facilitate face-to-face visits between biological father and K.D.

{¶ 53} The evidence discussed in our resolution of biological father's first assignment of error explains the efforts FCCS made to facilitate a bond between biological father and K.D. However, biological father's own history of domestic violence and sexual abuse resulted in the denial of the first ICPC, unquestionably contributing to a delay in the formation of any bond. Biological father once again attempts to shift any blame in a lack of bond with K.D. to FCCS despite his waiting more than four years to take a DNA test and

not following up on recommendations of the case plan in order to have more contact with K.D.  FCCS provided biological father with assistance for visits, made gas cards available, offered partial reimbursement for hotel stays, and made efforts to help biological father make steps towards approval as a possible placement for K.D.

{¶ 54} Based on the entire record, there was clear and convincing evidence that FCCS made reasonable efforts under the circumstances to facilitate biological father's participation in the case.  Ultimately, all of the factors combined led to the conclusion that granting FCCS's motion for permanent custody was in K.D.'s best interest.  We overrule biological father's second and final assignment of error.

## VI.  Disposition

{¶ 55} Based on the foregoing reasons, clear and convincing evidence supports the award of permanent custody to FCCS.  Having overruled biological father's two assignments of error, we affirm the judgment of the Franklin County Court of Common Pleas, Division of Domestic Relations, Juvenile Branch.

*Judgment affirmed.*

BRUNNER and BEATTY BLUNT, JJ., concur.